## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00069 (TFH)** |
| **v.** | : | |
| | : | |
| **JEFFREY SCHAEFER,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Jeffrey Schaefer to 30 days' imprisonment, two years' probation, a $2,000 fine, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Jeffrey Schaefer ("Schaefer"), age 36 years, participated in the January 6, 2021, attack on the United States Capitol — a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.

Schaefer pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence that includes 30 days' imprisonment and two years' probation is appropriate in this case because he: (1) on January 4, 2021, shared a text with a friend that read, "The world has gone mad" and "prepping for DC. Game face on;" (2) at approximately 4:31 p.m. on January 5, 2021, posted an image on his Facebook page of himself inside a vehicle with a caption that stated "DC Bound" with the American flag; (3) on January 6, 2021, watched

1

television and saw that a riot was taking place at the Capitol and decided to take an Uber to the Capitol; (4) approached the Capitol from the west front, observed police officers blocking access to the Capitol and clashing with rioters, and climbed over a short wall near scaffolding to get closer to the entrance to the Capitol; (5) entered the Capitol through an already broken window near the Senate Wing doors at approximately 2:50 p.m. and started chanting with other rioters in the Senate Wing foyer; (6) took photographs and recorded videos with his cell phone while inside the Senate Wing foyer, the Crypt, and a conference/meeting room; (7) at approximately 3:18 p.m., at the direction of police officers, exited the Capitol through the Senate Wing doors; and (8) remained on the grounds of the Capitol and witnessed rioters destroy camera equipment belonging to members of the media, then celebrated that destruction and boasted that he encouraged it.

Additionally, between January 6, 2021 and January 7, 2021, Schaefer posted images to his Facebook page that he had taken while inside the Capitol. He boasted that he had "been tear gassed 10 times" and witnessed "concussion grenades and lots of tear gas." He also posted profanities about CNN. On January 13, 2021, he sent a text in which he claimed that he had deleted his Twitter account; he also sent a series of statements that read: "They stole the election. It's all so fucked up . . . I'm just sickened . . . Treason and utter betrayal . . . After all the destruction for the last year and billions in damage and 25-30 deaths, they're calling a few impassioned people who took selfies an insurrection? Gimme a break." He deleted the photos and videos that he had made while inside and outside the Capitol on January 6, 2021, because he did not feel "comfortable" having them.

Even though he did not personally engage in violence or property destruction during the riot, the Court must consider that Schaefer's conduct on January 6, like the conduct of thousands

2

of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who tried to prevent a breach of the Capitol building, limit access to the Capitol building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic process of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). Schaefer's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators, and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Here, Schaefer's participation in a riot that actually succeeded in halting the Congressional certification renders a sentence of 30 days' incarceration and two years' probation both necessary and appropriate. Furthermore, the aggravating factors above explain why probation only is not warranted in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 17 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions — from the most mundane to the most

violent — contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Schaefer's conduct and behavior on January 6th.

*Defendant Jeffrey Schaefer's Role in the January 6, 2021 Attack on the Capitol*

On or about January 4, 2021, at approximately 4:59 p.m., Schaefer sent texts to a friend in which he stated, "The world has gone mad. . . Hahah prepping for DC. Game face on." On January 5, 2021, at approximately 4:31 p.m., he posted an image on his Facebook page of himself inside a vehicle with a caption that stated "DC Bound" with the American flag. That same day, Schaefer traveled from Delaware to Northern Virginia via his personal vehicle. He knew there was going to be a "Stop the Steal" rally in Washington, D.C. on January 6, 2021, and arranged to spend the night of January 5 at the home of a female he met on the Tinder app. On January 6, 2021, Schaefer watched television while at his date's home and witnessed rioters; based on what he observed Schaefer decided to take an Uber ride to the Capitol. He had the Uber driver drop him off near the west front of the Capitol and he approached the Capitol from that drop off point. *See* Image 1.

Image 1



When Schaefer arrived at the Capitol, he found police officers lined up at the top of the stairs on the Lower West Terrace between the scaffolding, encircled in blue in Image 1. Police officers were engaged in clashes with rioters to attempt to prevent them from gaining access to the Capitol. Schaefer observed the violence and circumvented the line of police officers by climbing over a short wall. Schaefer captured an image of the scene at the Capitol to his Facebook page and stated, "THIS IS UNREAL." See Image 2.

Image 2



At approximately 2:50 p.m., Schaefer gained access to the Capitol through an already broken window near the Senate Wing doors. Image 3 is a screenshot from a Capitol surveillance video of Schaefer as he entered the Capitol through a broken Senate Wing window.

Image 3



As mentioned in the Statement of Offense, after entering the Capitol and while standing in the Senate Wing foyer, Schaefer began to engage in a chant with other rioters. At the time, the Senate Wing foyer was filled with rioters, with rioters who had circumvented the line of police officers who had stood guard on the West Front of the Capitol. The rioters were confronting and challenging the police officers in the Senate Wing foyer. Image 4 is a screenshot from a Capitol surveillance video that captured Schaefer inside the Capitol as he and others chanted at the officers standing in opposition to their presence in the Capitol.

Image 4



As also mentioned in the Statement of Offense, Schaefer posted videos and photographs to his Facebook page with the username Jeffrey Von Rothschild II. While inside the Capitol, Schaefer traveled to the Crypt and took a photograph and, on January 6, 2021, posted the following photograph and a message to his Facebook page, see Image 5.

Image 5



Schaefer also ventured into a conference/meeting room that overlooks the west front of the Capitol. There, he took another photograph that showed the window had been cracked and lines of police officers assembled on the west front of the Capitol. On January 6, 2021, he posted the photograph of the broken window, additional photographs, and a video that he captured while inside and outside the Capitol to his Facebook page, along with the claim that he had "been tear gassed 10 times." See Image 6.

Image 6



On January 6, 2021, after spending approximately 28 minutes inside the Capitol,

Schaefer exited the Capitol through a Senate Wing door at approximately 3:18 p.m. See Image 7.

Image 7



Once outside the Capitol, Schaefer remained on the grounds and took photographs, including the photograph of police officers included in Image 6. He also posted images to his Facebook that showed a pile of destroyed media equipment and a caption that stated, "AP/CNN ENTIRE MULTI-CAMERA SETUP JUST GOT DESTROYED AFTER I STARTED CHANTING FUCK CNN OMGGGGG." See Image 8.

Image 8



On January 7, 2021, after being asked if he felt confident whether "Trump will remain," Schaefer replied, "Yepppp." Schaefer also sent a text to a friend who asked if he had been pepper-sprayed, stating, "Na. Just concussion grenades and lots of tear gas" "LOTS of tear gas." When asked what he thought was going to happen, Schaefer stated, "Trump could invoke the insurrection act/his executive order and seize the dominion machines under limited martial law Or he can concede . . . He could seize the machines and declassify everything from ufos to jfk."

On January 9, 2021, Schaefer sent a text expressing his awareness that "there's an FBI listing of people now." Afterward, Schaefer, someone who frequently sent texts and made posts to his Facebook page, went silent until January 12, 2021, when he sent a text in which he stated that he was "laying low from politics." On January 13, 2021, he sent a series of texts informing a friend that he had "been Mia from politics for a few days." When asked why, Schaefer said, "They removed Trump from social media . . . I deleted twatter . . . Not rly motivated about fb right now . . . They stole the election. It's all so fucked up . . . I'm just sickened . . . It's bad . . .

12

Treason and utter betrayal . . . After all the destruction for the last year and billions in damage and 25-30 deaths, they're calling a few impassioned people who took selfies an insurrection? Gimme a break."

*Jeffrey Schaefer's Voluntary Interview with the FBI*

On June 21, 2022, Schaefer gave a voluntary interview to the FBI. During the interview, he admitted to traveling to the Washington, D.C. area on January 5, 2021, and posted to his Facebook page that he was "D.C. Bound" only because he had arranged a Tinder date. However, when confronted with his social media posts that he made prior to January 6, 2021, and, specifically on January 4, 2021, about election fraud, Schaefer admitted that he did have an interest in what was going to happen in Washington, D.C. on January 6, 2021.

Schaefer stated that he watched television from his Tinder date's apartment in Alexandria, Virginia and saw that rioters were at the Capitol. He then decided to take an Uber to the Capitol. He arrived on the west front of the Capitol and made his way to the Capitol steps on the west front where rioters were clashing with police officers. He admitted that he climbed over a short wall near scaffolding to circumvent the police officers and to approach the Capitol. He then entered the Capitol through an already broken window. Inside the Capitol, he started chanting about election fraud with other rioters in the Senate Wing foyer. He traveled inside to different rooms inside the Capitol and took photographs and recorded videos. He left the Capitol because police officers told him to leave.

After leaving the Capitol, Schaefer stated that he witnessed individuals break media equipment.

Schaefer admitted that he posted several of the photos and recorded videos to his Facebook page, but could not remember if he posted them to any other social media sites. He

stated that he destroyed posts that he made to social media sites, removed himself from Twitter, and deleted photos and videos because he did not feel "comfortable" having them.

Schaefer claimed that his Facebook comments referring to being tear gassed, not being able to be stopped, and chanting about the media and destruction of media equipment was nothing more than "hyperbole" and were only made because of the attention it brought him on social media.

*The Charges and Plea Agreement*

On January 11, 2022, Schaefer was charged in a criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On January 13, 2022, he voluntarily turned himself in to law enforcement agents in Delaware for booking. On March 4, 2022, the United States charged Schaefer in a four-count Information with violating the same four offenses. On August 2, 2022, pursuant to a plea agreement, Schaefer pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G) and, by plea agreement, agreed to pay $500 in restitution.

## III.    Statutory Penalties

Schaefer now faces sentencing for the single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Schaefer faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

14

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 90 days of home detention, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should consider that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Schaefer's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether

the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Schaefer personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts by Schaefer is therefore not a mitigating factor in misdemeanor cases.

Schaefer arrived on the west front of the Capitol knowing that a riot was underway. Upon his arrival, he witnessed police officers attempting to prevent access to the Capitol and clashing with rioters. He bypassed the line of police officers by climbing over a short wall near the scaffolding on the west front of the Capitol to get to the Senate Wing doorway and windows and entered the Capitol through an already broken Senate Wing window.

Clearly, Schaefer took advantage of the situation at the U.S. Capitol that was created by other rioters and the opposition that they showed to police officers. From the perspective that he gained watching television at the home of his Tinder date, he knew that a mob had descended on the grounds of the Capitol and when he arrived on the scene, his perspective was so augmented that he commented that what was underway at the Capitol was "unreal." He circumvented the police officers by climbing over a wall near the scaffolding on the west front of the Capitol and forged a path that led him to the broken Senate Wing doors and windows. Although he may not have intended to enter the Capitol, or so he has claimed, his actions proved that he willingly joined with other rioters and climbed through one of the broken windows.

Once inside the Capitol, Schaefer protested alongside other rioters. His form of protest included chanting his views on Congress' intent to certify the election of President Biden and Vice-President Harris, as well as roaming through the Capitol for approximately 28 minutes. He only

left the Capitol because police officers told him to leave. While he complied with the officers' orders, he did not leave the grounds of the Capitol until much later, specifically, after he took photographs of the media's destroyed equipment and a line of police officers formed on the west front of the Capitol.

Schaefer shared the photos and videos that he captured while inside and outside the Capitol on January 6, 2021 with his Facebook and other social media followers and continued to express his views on the certification of the Presidential election afterward. On January 13, 2021, he stated, "They stole the election. It's all so fucked up . . . I'm just sickened . . . Treason and utter betrayal." He seemingly compared the treatment that the January 6 rioters were receiving to those involved in the Black Lives Matter protests, when he stated "After all the destruction for the last year and billions in damage and 25-30 deaths, they're calling a few impassioned people who took selfies an insurrection? Gimme a break." In an obvious effort to avoid the consequences of his actions, he deleted the photos and videos that he had made while inside and outside the Capitol on January 6, 2021, because he did not feel "comfortable" having them.

When confronted with his January 6 conduct, Schaefer admitted to the FBI that he had entered the U.S. Capitol. He immediately accepted early responsibility for his actions and participation in the riot. Schaefer's counsel quickly informed the government that he would accept the plea offer provided by the government.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence to include 30 days' incarceration as a condition of two years' probation.

### B.  The History and Characteristics of Schaefer

Schaefer is 36 years old and, since 2019, has been the owner of United Coachways, LLC, a charter transportation company located in Milton, Delaware. *See* ECF 18 ("Presentence Report"

or "PSR") ¶ 55.  Between 2005 and 2008, he attended Drexel University and Swinburne University of Technology, but did not obtain any certificates or degrees. PSR ¶ 52.

According to the PSR, Schaefer did not provide the required documentation relating to his assets, liabilities, and monthly cash in-flows and out-flows, which compelled the Probation Office to conduct independent research through commercial government tracking sources to complete a financial analysis. PSR ¶¶ 57-59. During the presentence investigation, Schaefer advised the probation officer that he has the ability to pay a fine. PSR ¶ 60.

As set forth in the PSR, his criminal history includes a conviction for marijuana possession that resulted in a $220 fine in 2011. PSR ¶ 32. He does not appear to have a drug or alcohol problem. *Id*. ¶¶ 48-49. The PSR does not suggest that Schaefer was mentally and/or emotionally incapable of avoiding his criminal conduct; instead, he chose to engage in criminal conduct. *Id*. at ¶ 47.

Schaefer has been compliant with the conditions of pretrial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

> But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.

(Statement of Judge Walton at sentencing hearing), *United States v. Mariposa Castro*, 1:21-cr-00299, Tr. 2/23/2022 at 41-42.

General deterrence is an important consideration because many of the rioters, including Schaefer, intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected

19

President. As noted by Judge Moss during the sentencing hearing in *United States v. Paul Hodgkins*, 21-cr-188 (RDM),

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters — especially those who intend to improperly influence the democratic process — that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Schaefer's lack of a significant criminal record, his acceptance of responsibility and quick surrender to authorities may suggest that incarceration is not necessary to deter him from future criminal activity. However, the combination of his: response to witnessing rioters clashing with police officers on the grounds of the U.S. Capitol; ignoring and sidestepping the officers by climbing over a wall to gain access to the Capitol; entering the Capitol and joining other rioters voicing opposition to police officers and the certification of the Presidential election; casually walking around the Capitol, including into the Crypt and a conference/meeting room, and taking

photographs and recording videos in the midst of a riot; encouraging and celebrating the destruction of the media's equipment; his Facebook posts and texts before, on, and after January 6; and, deletion of his Twitter account and the photographs and videos captured on January 6 because they made him uncomfortable or, more likely, represented proof of his criminal activity, suggests that a period of incarceration as a condition of probation is warranted. The recommended sentence will hopefully serve to press upon Schaefer and others like him that they may disagree with the outcome of an election, but cannot illegally stomp upon a legitimate democratic process and fail to abide by the principals and law that holds this country together.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Schaefer has pleaded guilty to Count One of the Information, charging him with one count of violating 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been

accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The sentences in those cases differed substantially from one another. But that range of sentences illustrates that, for Section 5104 violations where the entire statutory range is only six months, any sentence in that range cannot create an unwarranted disparity.

In *United States v. John Juran,* 1:21-CR-419 (TFH), this Court sentenced the defendant to 60 days' home detention.  Like Schaefer, Juran witnessed individuals shoving and overtaking law enforcement officers on the West Front of the Capitol. Juran also followed other rioters into the Capitol after it was breached. He remained inside the Capitol for approximately 10 minutes and left when he was ordered to do so by police officers. Juran cooperated with the FBI and admitted that he had entered the Capitol. Like Juran, Schaefer deleted photographs and videos that were stored on his mobile telephone and depicted events on January 6. However, Juran had no prior convictions, did not circumvent or challenge police officers, and spent far less time in the Capitol than Schaefer. Juran also did not encourage the destruction of property belonging to either the U.S. government or a media company.

In *United States v. David Schwartzberg*, 21-CR-338 (TFH), this Court imposed a 45-day sentence of incarceration, but without supervision. The aggravating factors in *Schwartzberg* bear some significant similarities to those in this case: Schwartzberg: (1) entered the U.S. Capitol through a broken window within minutes of the second breach of the Senate Wing Doors while the alarms were blaring, (2) after entering, proceeded to wave and encourage others into the besieged Capitol; (3) entered and remained in a sensitive area of the Capitol, specifically Senator Merkley's office; (4) took videos then posted them to social media websites about the activities occurring in the Capitol, (5) remained on the Capitol grounds after exiting the Capitol, where he filmed the violent destruction of media equipment; (6) admitted to deleting items from his phone, and (7) failed to consistently comply with the terms of his release in this case, even after receiving a judicial admonishment at his plea hearing.

In *United States v. Weisbecker,* 21-CR-682 (TFH), this Court imposed a period of 30 days' intermittent confinement as a condition of probation under 18 U.S.C. § 3563(b)(10) where the aggravating factors were that the defendant: (1) unlawfully entered the U.S. Capitol after watching rioters climb the scaffolding set up for the inauguration and law enforcement officers deploy tear gas to disperse rioters; (2) penetrated the Capitol all the way to the Speaker's Office, a highly sensitive area of the Capitol Building; (3) wandered through restricted hallways and into the Rotunda where he took photographs of himself; (4) posted statements on social media which demonstrated a total lack of remorse; and (5) verbally abused law enforcement officials who stopped and questioned him about January 6. Additionally, Weisbecker demonstrated contempt for public officials.

In *United States v. Daniel Herendeen,* 21-CR-278-2 (BAH), the defendant pleaded guilty to violating 18 U.S.C. § 1752(a)(1), not 18 U.S.C. § 5104. Herendeen: (1) expected to meet

violence at the U.S. Capitol before he even left Michigan and said, "If I die, I die saving the nation;" (2) consistent with that expectation, planned to take a gun and other tactical gear, but instead took black-tinted goggles, a flak jacket, tactical vest, a canister of bear spray, and a face covering depicting an American flag with him to Washington, D.C.; (3) at the U.S. Capitol on January 6, 2021, wore the goggles, flak jacket, and tactical vest and carried the bear spray inside a black military-style backpack; (4) entered the Capitol Building through the Senate Wing Door approximately seven minutes after the initial breach of the Capitol at that location; and (5) took photos and videos of himself and other rioters inside the Crypt of the Capitol and posted them on Facebook. Judge Howell imposed a sentence of 14 days intermittent confinement of two periods of 7 days each, two months' home detention with location monitoring, three years' probation, and $500 restitution. In part, the sentence was lenient because the defendant was the sole custodial parent of two teenagers, one with significant health problems that he was actively involved in treating.

In *United States v. Annie Howell,* 21-CR-217 (TFH), another 18 U.S.C. § 1752(a)(1) case, with facts similar to those here, this Court imposed a sentence of 60 days' incarceration to be served intermittently as a condition of probation. The aggravating factors were that Howell: (1) was preparing for violence prior to the attack, including discussing plans for bail, the acquisition of tear gas, and meeting with Proud Boys; (2) was aware of the potential for violence because, before she headed to the U.S. Capitol on January 6, she knew rioters had breached defensive perimeters established by police at the Capitol; (3) witnessed violence between other rioters and law enforcement officers before entering the Capitol, including the siege at the Lower West Terrace ("LWT") tunnel entrance, where she recorded several videos of the pitched battle between rioters and police there, and shared them on social media websites on January 6; (4)

climbed through a broken window to enter the Capitol, and sent messages and video to others from inside the Capitol; (5) made statements on social media during and after the riot that displayed a lack of remorse, including falsely blaming the law enforcement officers for the violence on January 6; and (6) likely destroyed evidence as indicated by missing social media posts and the fact that she reset her mobile device 20 days after the riot.

Finally, in *United States v. Charles Pham,* 21-CR-109 (TJK), the defendant similarly saw confrontations between rioters and police officers before entering into the U.S. Capitol on January 6; he yelled "we're taking the house back!; he entered an open office space; and, he was inside the Capitol for approximately 20 minutes. Pham received a sentence of 45 days' imprisonment.

In any event, the goal of the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

In all, after a review of the sentencings in these analogous cases and the applicable Section 3553(a) factors, the government believes that Schaefer should be sentenced to 30 days'

incarceration as part of a two-year period of probation for his role in the Capitol riot and that this sentence would not present an unwarranted sentencing disparity.

## V.     A sentence imposed for a petty offense may include both incarceration and probation.

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see, e.g.*, *United States v. Little*, 21cr315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same): *United States v. Ferreira*, 22cr210 (TSC) (D.D.C. October 6, 2022) (same).[2] In addition, for any defendant placed on probation, a sentencing court

---

[2] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§  5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A.  Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[3] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[4]

---

[3] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

[4] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### B. Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617

F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL

31

768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated

phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section

3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.

VI.   **A sentence of probation may include incarceration as a condition of probation,
though logistical and practical reasons may militate against such a sentence
during an ongoing pandemic.**

### A.  Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation, a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two."  *Id.*[5]

### B.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862,

at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above

---

[5] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not
intended to carry forward the split sentence provided in Section 3561, by which the judge imposes
a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404,
at *98.

and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at \*2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[6]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

---

[6] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

VII.    **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Accordingly, the U.S. Probation Office has recommended that the Court impose a sentence of 30 days imprisonment, a $2,000 fine, $500 restitution, and a $10 special assessment. ECF 20 (Sentencing Recommendation). However, balancing the § 3553(a) factors, notably a need to deter him future opposition to the functions of the U.S. Government, the government recommends that this Court sentence Schaefer to 30 days of incarceration as a condition of two years' probation, a $2,000 fine, 60 hours of community service, $500 in restitution, and a $10 special assessment. Such a sentence recognizes Schaefer's acceptance of responsibility for his criminal conduct, but, more importantly, protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Anita Eve*
Assistant United States Attorney
PA Bar No. 45519

## **CERTIFICATE OF SERVICE**

On this 10th day of November 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 */s/ Anita Eve*
Assistant United States Attorney